Helen M. Livesley v. Commissioner. Phil A. Livesley v. Commissioner.
Livesley v. Commissioner
Docket Nos. 66512, 66513.
United States Tax Court
T.C. Memo 1960-24; 1960 Tax Ct. Memo LEXIS 264; 19 T.C.M. (CCH) 133; T.C.M. (RIA) 60024; February 23, 1960
*264 1. Under the facts, the loss due to the worthlessness of corporate stock occurred during partnership's fiscal year 1954 and is deductible as an ordinary business loss or expense. Tulane Hardwood Lumber Co., 24 T.C. 1146 (1955), and J. T. Dorminey, 26 T.C. 940 (1956), followed. 2. The loss due to the worthlessness of advances made by petitioners' partnership to the same corporation is deductible during the same fiscal year as a nonbusiness debt under section 23(k)(4), I.R.C. of 1939. Morris J. Galen, Esq., for the petitioners. John D. Picco, Esq., for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: The respondent has determined the following deficiencies in the petitioners' Federal income tax: Fiscal Year Ended
Deficiency
July 31, 1952
$12,348.01
July 31, 1953
1,159.53
*265 The issues, as framed by the parties, are: 1. Whether the partnership owned and operated by the petitioners, or Phil A. Livesley in his individual capacity, was the purchaser of stock in the Deschutes Valley Potato Company. 2. Whether the loss due to the worthlessness of said stock constitutes a capital loss or is deductible as an ordinary business loss or expense. 3. Whether the loss due to the worthlessness of advances made by the partnership to the company is deductible as a business bad debt within the meaning of section 23(k)(1), Internal Revenue Code of 1939, or deductible as a nonbusiness bad debt, subject to the limiting provisions of section 23(k)(4), Internal Revenue Code of 1939. 4. Whether said losses were sustained during the fiscal year ended February 28, 1954, (with carrybacks to the years in question). Findings of Fact The stipulated facts are so found. The petitioners, Phil A. Livesley and Helen M. Livesley, are individuals residing in Portland, Oregon, and hereinafter are sometimes referred to as Phil and Helen, respectively. The petitioners were husband and wife at all times pertinent hereto, and they filed their joint Federal income tax returns for *266 their fiscal years ended July 31, 1952, 1953, and 1954, with the director of internal revenue at Portland, Oregon. After engaging for many years as a sole proprietor in the produce business as a food broker or distributor and also as a wholesale dealer, Phil gave Helen a 15 per cent interest in his business on August 1, 1951. Thereafter they engaged in this business as partners under the assumed name of "Phil A. Livesley" and dealing primarily in potatoes and onions. There was no written partnership agreement. The firm kept its books and records on an accrual method of accounting and its returns were filed on the basis of fiscal years ending on the last day of February. Its business office was located in Portland, Oregon. Phil operated the partnership as he had operated his prior individual proprietorship. He did all the buying and selling and made all the decisions for the partnership. Helen's participation in the business was limited to bookkeeping, secretarial and miscellaneous duties, including waiting on customers and filling orders. She worked approximately 4 hours a day, and did not work every day. After the partnership was formed, Phil continued to deal in the commodities *267 futures market, but it is not shown whether such trades were speculative or were hedging transactions designed to offset the partnership's commitments. The brokerage house handling such dealings was not informed of the creation of the partnership. The profits and losses derived from the trading conducted through said brokerage house were included in partnership income. The account maintained with the brokerage firm remained in Phil's name, but it was the partnership's account. The partnership did not file an assumed name certificate until Phil had been informed on two occasions that such was required by state law. After the second occasion, Phil asked an attorney about this, and he was told that such a certificate should have been filed. The attorney prepared the necessary papers and the partnership was registered with the County Clerk of Multnomah County, Oregon, in October 1952. In the produce industry, and as used herein, the term "country shipper" (or originator) refers to that party who buys produce directly from the farmer. Up until approximately 1947, the country shipper would then sell the produce to a party known as a distributor (or broker), and then the produce would *268 be resold to the wholesaler (or factor), who sold to the retail outlets. Since 1947, the country shipper has increasingly dealt directly with the wholesaler, thus by-passing the distributor. In the potato market today, the distributor as such has been substantially eliminated. In order to remain in the potato business, some distributors attempted to obtain an original source of supply, either by putting in their own buyers and shipping plant in the producing areas, i.e., becoming country shippers, or by acquiring an interest in an existing country shipping organization, or by growing their own potatoes. In the produce industry potatoes and onions are usually handled and sold together. The partnership was primarily engaged in the business of buying and selling those commodities. It also handled small quantities of seed potatoes, onion sets, and related items, when it was felt that a profit could be made. Prior to 1952, the partnership was a country shipper of onions and a distributor of potatoes, although it did purchase a limited quantity of potatoes from the farmers in the Portland area. The partnership had an extensive onion business and sold onions primarily on the West Coast *269 and to certain exporters. The partnership's potato sales were substantial, but not at the same level as its onion sales. In its fiscal years ended February 1952, 1953, and 1954, its sales (in even hundreds) were: Ratio of
Potato
Onion
Potato Sales
Fiscal Year Ended
Sales
Sales
to Total Sales
February 1952
$136,900
$297,200
32%
February 1953
311,600
512,900
38%
February 1954
128,900
205,600
39%
There was a nationwide shortage of potatoes commencing in 1951. Production figures in bushels for the years 1949 through 1953 (rounded off) were as follows: United
11 Western
Year
States
States
Oregon
1949
402,400,000
109,000,000
11,400,000
1950
429,900,000
127,500,000
12,900,000
1951
320,500,000
95,400,000
10,200,000
1952
349,100,000
115,300,000
11,400,000
1953
380,100,000
118,500,000
12,700,000 Under the method of operation used by the partnership in early 1952, petitioners believed that it was impossible to purchase potatoes with which to transact the business that was available [1] and still be in a position to sell them at a competitive price, for at times during the 1951-1952 season, the demand *270 for potatoes exceeded their supply and some buyers, such as the partnership, were on occasion unable to purchase potatoes. During this same period, the partnership also found that the elimination of the distributor in the marketing structure of potatoes often set the price it had to pay for potatoes at a level that would not enable it to resell them at a profit. The partnership also wanted a source of supply of potatoes that would provide protection in case of a shortage *271 and for the expansion of its business, and believed that these goals could be obtained if it attained the position of a country shipper of potatoes in central Oregon, where a desirable source of potatoes existed. The partnership considered the possibilities of building a shed in central Oregon and sending its own buyers there, or of buying an interest in a country shipper of potatoes in central Oregon which had equipment, warehouses, packing plant, and which was well established in that area and had the necessary contacts with farmers. In May 1952, Phil learned that the owners of the Deschutes Valley Potato Company, a corporation hereinafter referred to as the company, were interested in selling their corporate stock. The company, and its predecessor, had for many years prior to 1952 engaged in business as a country shipper of potatoes in central Oregon. The company's headquarters was in Redmond, and it had warehouses in Prineville, Madras, and Bend. It was well established in the surrounding area and in 1952 it was handling about 40 per cent of the potatoes grown in that section of Oregon. The company had 250 shares of capital stock outstanding and these shares were owned in equal *272 amounts by C. A. Loop and C. K. Simmons, sometimes hereinafter referred to as the sellers. The financial statement of the company as of June 30, 1952, disclosed that its inventory of $32,273.59 consisted of bags, twine, and a small amount of fertilizer, but the inventory did not contain any potatoes. Phil examined this statement and a list of the company's physical inventory and equipment, he was generally familiar with the company's method of operation, and had seen its facilities in the past. The values placed on the inventory and physical assets of the company by its owners were unimportant to Phil. He felt that it would be cheaper for the partnership to purchase an interest in a going country shipper rather than to build and develop a new one. The company had assets, equipment and personnel to do the job of buying potatoes. These were the factors that interested the partnership and it might have purchased the company's stock, even if the company had been losing money at the time of the purchase, in order to obtain the equipment and to get into the central Oregon potato market. After preliminary negotiations, and on July 3, 1952, an "Earnest Money Receipt" was executed on *273 behalf of "Phil A. Livesley, H. I. Anderson and L. R. Clark," as purchasers. Pursuant to said instrument, the purchasers agreed to buy and the sellers agreed to sell the stock of the company. This instrument also recited the terms of payment and that the deposit of $10,000 received by the sellers from the purchasers would apply on the purchase price of the stock. On August 2, 1952, the sale was consummated and an Agreement of Sale and Purchase was executed by the sellers and "H. I. Anderson, Phil A. Livesley, Jr., L. R. Clark, and Robert M. Duncan, Jr.," as purchasers, and hereinafter referred to as the purchasers. This sales agreement provided, among other things, for a purchase price of $86,029.38, a down payment of $40,429.38 and the balance payable in installments evidenced by purchaser's notes. It also provided that the purchasers, in the ratio of their stock ownership, personally guarantee the payment of preexisting company notes totaling $60,000 in favor of the sellers. In addition, the sales agreement provided that the company's stock be placed in escrow as security for the payment of these notes and of the balance due on the purchase price of the stock. A summary of the *274 shares of stock acquired by the purchasers in the transaction of August 2, 1952, their respective costs and other data follows: Agreed
Share of
Per-
Net
sonal Guar-
Per
Agreed
antee of
Cent
Shares
Less
Pur-
of Corpo-
of
of
Subsequent
chase
rate Notes
Purchaser
Stock
Stock
Cost
Adjustment
Price
($60,000)
Livesley (or
40
100
$34,411.75
$1,671.40
$32,740.35
40%
Partnership) *
Anderson
25
62 1/2
21,507.34
25%
Clark
25
62 1/2
21,507.34
25%
Duncan
10
25
8,602.95
10%
Totals
100
250
$86,029.38
100%
It is stipulated that $16,740.35 was paid on account of the purchase price of the Livesley stock, in amounts and at dates as follows: July 3, 1952
$ 5,000.00
August 2, 1952
8,205.88
August 2, 1952
3,205.87
December 15, 1952
1,000.00
December 19, 1952
1,000.00
$18,411.75
January 28, 1953 - Refund
(835.70)
January 30, 1953 - Refund
(835.70)
$16,740.35 and that the first three items above were paid with partnership checks, [2] drawn on partnership funds, *275 signed by Phil and charged to his drawing account. The two $1,000 items were also charged to Phil's drawing account but the mechanics of payment to Loop and Simmons are unclear. At the close of the partnership's fiscal year ending February 28, 1953, Phil's drawing account was closed out to the partners' capital accounts on the basis of their profit-and-loss-sharing ratio, i.e., 85 per cent to Phil and 15 per cent to Helen. These entries were made without professional accounting advice and Phil intended them to show that the partnership had bought the stock. The purchase of the stock was recorded on a memorandum ledger sheet in the general ledger of the partnership, which sheet was entitled "Deschutes Valley Potato Co. Stock - 100 shares" and all transactions regarding this stock were recorded on it in the ordinary course of business. Phil made a partnership financial statement in September 1953 to Herbert Ambler, the vice president of The United States National Bank, who regularly handled the partnership *276 account. Such statement purported to show conditions at February 28, 1953, and included among the partnership assets "100 shares Deschutes Valley Potato Co. $34,411.75. Stock in escrow in US Bank until paid in full - * * *." Phil acted for and on behalf of the partnership with respect to the stock purchase, and the partnership was in fact the actual purchaser of the company's stock. The partnership purchased the company's stock in order to acquire and maintain a steady supply of potatoes at prices that would enable it to resell them at a profit. The partnership needed this, or a comparable supply source, in order to maintain the business it had already developed and in order to tie in and support its growing onion business. The purchase of the company's stock was a reasonable and necessary act in the conduct of the partnership's business at that time and it did not intend to hold the stock indefinitely or as an investment. Prior to the acquisition of the company's stock, the partnership had bank loans outstanding but its financial condition was very good. It was not the usual practice of the partnership to lend or advance money, but at times it had made advances against a contract *277 that had been purchased or to a grower who needed a little harvest money. The partnership had no investments or interests in outside businesses which were unconnected with its business. Following its acquisition of the company's stock, the partnership notified its customers of this interest, and thereafter the partnership acquired the potatoes needed in its business through the company. During the next buying season (fall of 1952 and spring of 1953), the partnership purchased 14,000 hundred-pound bags of potatoes from the company, whereas during the 1951-1952 season it had only so purchased 1,400 such bags. After the above acquisition, Phil continued to devote his time to the partnership's business, rather than to that of the company. Although Phil served as secretary-treasurer and as a director of the company during the period the partnership held its stock, he was not active in its management. After the acquisition Duncan became resident manager of the company at a salary of $7,200 per year, with a yearly bonus not to exceed $3,000. Salaries of $9,600 were later set up for Phil, Anderson and Clark, but these salaries were subsequently waived and were never paid because of unprofitable *278 operations. The company kept its books and records on an accrual basis and its Federal income tax returns were filed on the basis of fiscal years ending June 30. Operations for the fiscal years ending June 30, 1953, and June 30, 1954, were conducted at a loss. The partnership made a number of advances to the company during the latter part of 1952 and 1953. The advances made by the partnership were recorded on its books as loans to the company, with 6 1/2 per cent interest. The bulk of these advances occurred in the fall of 1952 when the company was purchasing large quantities of potatoes, which were placed in storage in anticipation of a scarcity in potatoes during the coming year. The O.P.S. had imposed price ceilings on potatoes on January 19, 1952, following the small-production calendar year of 1951. These ceilings were removed on about June 6, 1952, and prices immediately increased. Market reports indicated that production in calendar year 1952 would be only slightly above 1951 and many buyers believed that prices would remain high and supplies scarce; however, 1952 production exceeded expectations and prices declined more than 50 per cent. United States Department of Agriculture *279 statistics on potatoes show the following: Average Price per
Year
Bushel to Farmer
United States
1952
$1.94
1953
.781
11 Western States
1952
1.77
1953
.724
Oregon
1952
1.93
1953
.75
The financial condition of the company became increasingly worse during the period it was operated by the purchasers. In December 1953, installments due on the company's and petitioners' obligations to the sellers became due, but they were not paid because of a lack of funds. Discussion of a settlement between the sellers and purchasers also began in that month. In January 1954, the sellers served notice upon the corporation and the purchasers that they were in default on their notes. At that time, the company had no money in the bank and even lacked funds to meet its payroll, much less to pay its obligations to creditors. The settlement negotiations continued through January, February, and up until 1 or 2 days prior to March 14, 1954. On that date, the purchasers and sellers entered into a "Settlement Agreement." A "Supplemental Agreement" was also executed by Phil and the sellers at that time. Under these agreements, Phil and Helen were released from all *280 personal liability to the sellers, except for a $3,200 note which was for potatoes the partnership had purchased from the company on open account. In addition, the notes that the company had given the partnership to cover the advances it had made to the company were assigned to the sellers, and the notes payable to the sellers that had been executed by Phil and Helen were returned to them and cancelled. At a date subsequent to March 11, 1954, a journal entry was made on the partnership books to record the acquisition of the company's stock on August 2, 1952. At the same time, journal entries were made writing off the stock of the company and the advances made to the company by the partnership. All of these entries, which were predated February 28, 1954, were recorded as directed by the attorney who was then employed by the partnership. These entries, as well as the entries previously made contemporaneously by petitioners, are all shown by joint exhibit 19-T as follows: "The following entries were made on [Phil's] drawing account as set up on the partnership books: Date
1952
Item
Debits
Credits
July 3
Deposit
$ 5,000.00
Aug. 2
C. A. Loop
8,205.88
Aug. 2
C. K. Simmons
3,205.87
Dec. 15
c/o Deschutes Valley Potato Company, Loop -
2,000.00
Simmons
1953
Feb. 6
C. A. Loop check
$ 835.70
C. K. Simmons check
835.70
*281 "On February 28, 1954, credit entries were made in both partner's capital accounts to record the purchase of the Deschutes Valley Potato Company stock. "The books of the partnership record the following entries as 'Notes Receivable': Date
1953
Item
Debits
Credits
June 20
Deschutes Valley Potato Co.
$ 3,000.00
July 2
Deschutes Valley Potato Co.
2,000.00
July 12
Deschutes Valley Potato Co.
2,500.00
Sept. 28
Deschutes Valley Potato Co.
5,000.00
1954
Feb. 28
Apply $5,000 open account against $5,000 note
$ 5,000.00
Feb. 28
To write off Bad Debt - Note
7,500.00
"The books of the partnership record as 'Notes Receivable' - Deschutes Valley Potato Company, Redmond, Oregon, the following: Date
1952
Item
Debits
Credits
Sept. 15
Transferred from Old Ledger
$ 7,500.00
Sept. 25
Transferred from Old Ledger
7,500.00
Sept. 29
Transferred from Old Ledger
7,500.00
Oct. 30
Transferred from Old Ledger
5,000.00
Feb. 21
Payment
$10,000.00
1953
May 19
Payment of Lot 1100-111M-713
4,000.00
May 22 Payment of Lot 1125-8 NW 9187
1,400.00
June 20
Advance to John Harkoff as of Sept. 23,
1,000.00
1952
June 20
Part payment on 10# bags (such 2140)
500.00
Feb. 28, 1954
To write off as Bad Debt
12,600.00
*282 "The journal of the partnership records the following entries: Date
1954
Item
Debits
Credits
Feb. 28
Accounts Payable - Accrued - DVPCo
$ 5,000.00
Notes Receivable - DVPCo
$ 5,000.00
To apply accounts payable Potatoes against Note Receivable. Date
1954
Item
Debits
Credits
Feb. 28
Buying
$20,100.00
DVPCo, Note Receivable
$12,600.00
DVPCo, Note Receivable
7,500.00
To charge off DVPCo Note Receivable due to loss of stock and settlement on DVPCo deal. Feb. 28
Deschutes Valley Potato Company Capital
$32,740.35
Stock
Note Payable - C. A. Loop
$ 8,000.00
Note Payable - C. K. Simmons
8,000.00
Phil A. Livesley, Net Worth
14,229.30
Helen M. Livesley, Net Worth
2,511.05
To record DVPCo stock acquired August 2, 1952, but not previously carried in the ledger. Stock net cost was $32,740.35. Date
1954
Item
Debits
Credits
Feb. 28
Expense Buying
$16,740.35
Notes Payable, C. A. Loop
8,000.00
Notes Payable, C. K. Simmons
8,000.00
Capital Stock, DVPCo
$32,740.35
To write off DVPCo stock as settlement plan of stock. "The drawing *283 account of Phil Livesley, Jr., on the books of the partnership for the fiscal year ended February 28, 1953 was closed and charged 85% to the capital account of Phil Livesley and 15% to the capital account of Helen Livesley. "The purchase of the Deschutes Valley Potato Company stock was recorded [found to have been so recorded on or about August 2, 1952] on a memorandum ledger sheet in the general ledger of the partnership entitled 'Deschutes Valley Potato Co. stock - 100 shares'." A loss was claimed as a deduction by the partnership on its return for the fiscal year ending February 28, 1954, in the amount of $36,840.35. This loss was described as "Buying Expenses" and computed as follows: Amount Paid on Stock
$16,740.35
Amount Advanced to Corporation
20,100.00
$36,840.35
Petitioners reported a net operating loss on their joint income tax return for their fiscal year ending July 31, 1954, which resulted in whole or in part from the deduction "Buying Expenses" taken on the partnership return. The petitioners filed an application for tentative carryback adjustment, applying the net operating loss deduction in the prior years, and requesting a refund of the *284 overassessment in income tax in the earlier years which resulted from such additional deduction. Tentative refunds of the claimed overassessments were made to the petitioners by the district director in accordance with the provisions of section 6411 of the Internal Revenue Code of 1954. The company's stock purchased by the partnership and the advances made by the partnership to the company became worthless within the fiscal year ended February 28, 1954. Opinion 1. The loss due to the worthlessness of the here pertinent 40 per cent of the company's stock was $16,740.35. The dual issue is whether such loss is capital, or is deductible as an ordinary business loss or expense and the year of such loss. As stated by the Supreme Court in Commissioner v. Heininger, 320 U.S. 467, 475: "Whether an expenditure is directly related to a business and whether it is ordinary and necessary are doubtless pure questions of fact in most instances." (In that case the purchase of stock in order to terminate an agency contract was held to be business expense.) In the instant case the respondent has devoted much of his brief to argument of the proposition that *285 Phil, as an individual was the purchaser of the stock. We agree that this would take the stock one step away from the business of the partnership and would tend to show that the purpose or reason for the purchase was other than directly related to the partnership's business. We have dealt fully in our findings of fact with the circumstances surrounding the acquisition and holding of the stock and its recordation in the partnership's books. It is true that some of the entries in these books tend to indicate that Phil was the purchaser, others tend to indicate that Phil and Helen as individuals were the purchasers, and in the same 85-15 per cent ratio in which they owned the partnership. These books were kept and entries made without professional advice and they are not conclusive. Of far greater weight is the fact that Phil included the stock when making a financial statement for the partnership, and the over-all showing by the entire record that the stock was purchased to insure a steady, fairly-priced supply of potatoes for the partnership business. We feel that the conclusion that the partnership was the actual purchaser and owner is inescapable, and we so hold. Our decision *286 has been based upon all of the facts surrounding the transactions. Cf. Doyle v. Mitchell Brothers Co., 247 U.S. 179, 187. We now turn to the date and character of the loss suffered by the partnership when this stock became worthless. Respondent argues that such cases as Western Wine & Liquor Co., 18 T.C. 1090, Charles A. Clark, 19 T.C. 48, and Edwards v. Hogg, 214 F. 2d 640, are distinguishable since they dealt with losses arising from distilling company stock which had been purchased in order to acquire specific rights to buy certain merchandise. Respondent argues that such facts show that in the cited cases taxpayer was forced to buy the stock in order to obtain whisky while in the instant case this was not necessary to obtain potatoes. Petitioners have clearly established that it was reasonable and necessary for the best interests of the business of their partnership that it acquire a dependable and competitively priced source for potatoes. It had been able to buy small quantities from the company before the partnership acquired its stock, but in the season following such acquisition its purchases increased tenfold, from 1,400 *287 to 14,000 hundred-pound bags. It is not necessary for petitioners to prove that, absent the claimed expense, the partnership's business would have been crippled or would have failed. Responsible businessmen make legitimate expenditures every day which would not measure up to such a "survival" test. In Tulane Hardwood Lumber Co., 24 T.C. 1146, taxpayer purchased a debenture issued by a manufacturer in order to obtain a source of supply of plywood. About 4 years later the manufacturer failed and the debenture became worthless. In J. T. Dorminey, 26 T.C. 940, a taxpayer in the produce business dealing largely in bananas sought to obtain a source of supply by becoming the major stockholder of and by guaranteeing loans made to U.S. and Panama Navigation Company, which was engaged in the banana trade. Navigation defaulted on the loans about a year later and taxpayer was required to pay under his guarantees. In each case it was found that the expenditures were incidental to and proximately related to the taxpayer's business and that the losses were deductible as a business expense. Neither case involved specific lots of goods as did the distillery-stock cases. *288 Having found that the partnership purchased the Deschutes stock, not as an investment, but to acquire a dependable and fairly-priced source of supply of potatoes, we feel that this aspect of the instant case is indistinguishable from, and is governed by Tulane and Dorminey, supra, and we hold that the loss from the worthlessness of such stock in the amount of $16,740.35 is deductible as a business expense. We hold further that this loss, and the loss of $20,100 on the advances to the company, both occurred during the partnership's fiscal year 1954. In December 1953 the company started defaulting its obligations, a formal notice of default was served on the company in January 1954 and in that month it lacked funds to meet its payroll. Settlement negotiations continued throughout January and February 1954 and though not formalized until 2 weeks later, they were consummated as of February 24, 1954. We conclude that by February 28, 1954, there was no reasonable possibility that the partnership would realize anything on the stock or on the loans. Richard M. Drachman, 23 T.C. 558, 564; Tulane Hardwood Lumber Co., supra. 2. We take an entirely different *289 view of the character of the loss due to the worthlessness of the advances made to the company by the partnership and amounting to $20,100. It is clear that the partnership made advances to the company in the latter part of 1952 and in 1953, recording them in its books as loans bearing 6 1/2 per cent interest. It is also clear that the company used the money to purchase and store large quantities of potatoes, but it is far from clear that this use was in furtherance of or connected with any business purpose of the partnership. The record establishes that it was not the usual practice of the partnership to lend money. In the past it had "at times made advances against a contract it had purchased [3] or to a grower who needed a little harvest money." The advances here made to the company are in no way comparable. We know that first Phil and later the partnership had had a commodities futures account with Merrill Lynch, Pierce, Fenner and Bean, but we do not know that this account was ever used for speculative (as opposed to hedging) purposes. There is no evidence that speculation was a part of the partnership's business. *290 The following excerpts from Phil's testimony are revealing: "Q. What you mean is that you were out there speculating on the market. I mean, the corporation was speculating on the potato market? "A. Not necessarily. It was a combination of merchandising and speculation. "Q. Weren't you buying and holding for a long time and selling on anticipation of the market getting better? "A. We were, yes. * * *
"Q. Well, can I state it in this way? You people, the purchasers of this stock, were taking the opportunity of speculating on the potato market, through the corporation? Would that be correct? "A. Yes. The potatoes that I wanted to buy, we bought through the corporation. * * *
"When we purchased the stock to secure a source of supply and insure a source of supply, there was no thought of speculating on potatoes. There was no thought of speculating. The market conditions that developed made it appear in our better judgment that it would be well to buy potatoes ahead. It turned out that it was very poor judgment." The most favorable conclusion possible for petitioners from the above testimony and from the entire record is that some part of these advances was made *291 to the company for nonspeculative purposes. But we have not been shown whether the company had any need for funds before speculation was commenced, nor sufficient detail of its finances and methods of operation to conclude that, absent speculation, it would not have been able to supply all the potatoes needed for the partnership's business from its own resources. Thus we feel that there has been no showing that any part of these advances was made to enable the company to supply the partnership its needed potatoes, and consequently use of the rule of the often cited Cohan case is not warranted here. Cohan v. Commissioner, 39 F. 2d 540. We hold that this loss in the amount of $20,100 is deductible only as a nonbusiness bad debt in the partnership's fiscal year 1954 under, and subject to the limitations of section 23(k)(4), Internal Revenue Code of 1939. Decisions will be entered under Rule 50. Footnotes
1. Through dealings with certain exporters, Phil believed that the partnership was in a position to expand its potato sales if a source of supply of potatoes sufficient to meet the needs of these exporters could be secured. As the partnership's export business increased, it became more evident that a dependable source of supply of potatoes must be acquired by the partnership in order to properly tie in potato and onion sales and that potatoes could only be handled profitably if they were obtained at the country shipper level. Phil had first realized that tying in potato and onion sales was an essential element to the growth of his produce business when it was resumed after his discharge from the service in 1946.↩
*. Hereinafter referred to as "Livesley stock."↩
2. Such checks are imprinted near the top: Phil A. Livesley Potatoes - Onions 132 S. E. Alder Street East 0678 and at the bottom: Phil A. Livesley, Produce Acct. By ↩
3. We assume a contract made by a country shipper with a grower, therefore the advance would be to the grower.↩